328 So.2d 40 (1976)
In re Mary Jo TIERNEY.
Nos. 75-774, 75-1105 and 75-1106.
District Court of Appeal of Florida, Fourth District.
February 27, 1976.
*41 S. Lindsey Holland, Jr., of Crofton, Holland, Starling, Harris & Severs, P.A., Melbourne, for appellant.
Robert L. Shevin, Atty. Gen., Tallahassee, and C. Marie Bernard, Asst. Atty. Gen., West Palm Beach, for appellee.
MAGER, Judge.
This appeal presents the question of whether a news reporter has a qualified privilege to maintain the confidentiality of news sources and thereby refuse to answer questions propounded by a grand jury concluding two investigative matters initiated within.
The appellant was twice adjudged guilty of willful contempt for failure to answer questions propounded to her by the Brevard County Grand Jury which had been in extended session for the purpose of concluding two investigative matters initated *42 during its original term.[1] The matters to be considered by the grand jury during their extended term involved the investigation of two governmental agencies.
Appellant was first subpoenaed to appear before the grand jury on April 15, 1975, which was seeking information relating to a possible violation of section 905.27, F.S.,[2] namely, a "leak" in its then continuing investigation under its extended order. The appellant, who was granted immunity from prosecution for any crime (except perjury) under investigation which might be demonstrated by the testimony sought, declined to answer certain questions which might pertain to some person or persons whose identity would likely disclose the source of the "leak" under investigation. Appellant based her denial upon the ground that her refusal to answer questions was within the right guaranteed to her under the First Amendment to the United States Constitution.
Pursuant to the appellee's petition for a rule to show cause and the consideration of the various other pleadings filed by the parties the trial court on April 30, 1975 entered an order adjudging appellant guilty of willful contempt for her failure to answer questions propounded to her and directing that she be incarcerated for six hours in the Brevard County Jail commencing at 11:30 A.M. on May 13, 1975. The order of contempt contained a proviso stating, in part, that "at such time as Respondent, MARY JO TIERNEY, may reconsider and agree to answer the questions, then she will be entitled to immediate release."
Subsequently another subpoena was issued commanding appellant to appear before the grand jury on May 6, 1975. Appellant appeared, was again granted immunity and again refused to answer questions relating to a possible violation of sec. 905.27, on the same constitutional grounds heretofore cited.[3] On May 30, 1975, appellant was ultimately adjudged guilty of willful contempt for failure to answer questions propounded to her in this second instance. The court directed that appellant be incarcerated for thirty days in Brevard County Jail commencing on May 30, 1975 and pay a fine in the amount of $500. The order of contempt contained the following proviso, "at such time the Respondent, MARY JO TIERNEY, may agree to answer the questions then she will be entitled to immediate release".
The claimed qualified privilege asserted by appellant to exist in these circumstances was carefully and exhaustively examined and rejected by the United States Supreme Court in its landmark decision in Branzburg v. Hayes, 408 U.S. 665, 92 S.Ct. *43 2646, 33 L.Ed.2d 626 (1972). There, Branzburg, a news reporter, had written two different articles on two separate occasions detailing his observations of marijuana activities and interviews with drug users whose identities were not revealed. As a result of these articles Branzburg was subpoenaed to appear before two different grand juries but refused to identify the individuals that were the subjects of these articles. Branzburg was unsuccessful in his efforts to have the state courts recognize the claimed adverse impact on his First Amendment rights which would result from the questions propounded by the grand jury. In the state proceeding which gave rise to review by the United States Supreme Court an order was entered protecting Branzburg from revealing "confidential sources of information" but requiring that he "answer any questions which concern or pertain to any criminal act the commission of which was actually observed by him".[4]
In the Branzburg decision the Supreme Court of the United States clearly recognized the significance and application of First Amendment protection to newsgathering without which "freedom of the press could be eviscerated". The court, however, carefully pointed out that requiring a news reporter to appear before and answer questions propounded by a grand jury did not involve "intrusions upon speech" or a "restriction on what the press may publish" or an "express or implied command that the press publish what it prefers to withhold". In this regard the Supreme Court observed:
"... No exaction or tax for the privilege of publishing, and no penalty, civil or criminal, related to the content of published material is at issue here. The use of confidential sources by the press is not forbidden or restricted; reporters remain free to seek news from any source by means within the law. No attempt is made to require the press to publish its sources of information or indiscriminately to disclose them on request.
"The sole issue before us is the obligation of reporters to respond to grand jury subpoenas as other citizens do and to answer questions relevant to an investigation into the commission of crime. Citizens generally are not constitutionally immune from grand jury subpoenas; and neither the First Amendment nor any other constitutional provision protects the average citizen from disclosing to a grand jury information that he has received in confidence. The claim is, however, that reporters are exempt from these obligations because if forced to respond to subpoenas and identify their sources or disclose other confidences, their informants will refuse or be reluctant to furnish newsworthy information in the future. This asserted burden on news gathering is said to make compelled testimony from newsmen constitutionally suspect and to require a privileged position for them.
"It is clear that the First Amendment does not invalidate every incidental burdening of the press that may result from the enforcement of civil or criminal statutes of general applicability... ." (92 S.Ct. at 2657)
The essence of the Branzburg decision (as reflected in the syllabus of that opinion) is simply that the First Amendment does not relieve a newspaper reporter of the obligation that all citizens have to *44 respond to a grand jury subpoena and answer questions relevant to a criminal investigation, and therefore the Amendment does not afford a constitutional testimonial privilege to conceal facts relevant to a grand jury's investigation of a crime or to conceal the criminal conduct of a source of evidence thereof.
The Supreme Court of the United States refused to impose as a tripartite criteria for a news reporter's response to a subpoena or to the answering of questions propounded by a grand jury that the government demonstrate: "that society's interest is `immediate, substantial, and subordinating'; that there be a `substantial connection' between the information desired of the witness and the interest of society in the subject matter of the investigation; `and that the means of obtaining the information is not more drastic than necessary to forward the asserted governmental interest.'" In this regard see Morgan v. State, 325 So.2d 40, Second District Court of Appeal Case No. 74-619 opinion filed December 3, 1975.[5]
Unless it can be shown that the questions propounded were not relevant and material to a good faith grand jury investigation then no First Amendment privilege exists. This we respectfully believe the appellant has failed to demonstrate.
Measuring the instant case by the foregoing standard we are of the opinion that the questions propounded by the grand jury concerning "leaks" related directly to the sanctity and integrity of the grand jury function and hence were directly relevant and material to a possible violation of sec. 905.27. See footnote 2, supra. Moreover, the questions were relevant and material to the overall scope and purpose of the investigations then under consideration.
It should be clearly pointed out that the majority and concurring opinions in Branzburg recognized that newsgathering is not without its First Amendment protections and that "grand jury investigations if instituted or conducted other than in good faith, would pose wholly different issues for resolution under the First Amendment." In particular, the Supreme Court stated:
"Official harassment of the press undertaken not for purposes of law enforcement but to disrupt a reporter's relationship with his news sources would have no justification. Grand juries are subject to judicial control and subpoenas to motions to quash. We do not expect courts will forget that grand juries must operate within the limits of the First Amendment as well as the Fifth." (92 S.Ct. at 2670.)
It is not, however, necessary for the state to first demonstrate that the tripartite considerations have been met before inquiry can be made of a news reporter. Rather, the burden rests with the news reporter if he "believes the grand jury investigation is not being conducted in good faith," to seek "access to the court."
The gist of the Branzburg decision is a recognition of the absence of any qualified or conditional privilege on behalf of news reporters subpoenaed before a grand jury and the absence of any burden upon the government to establish any condition or predicate to such subpoenaing and questioning. The Branzburg court, however, was careful to point out that the state legislatures are free "to fashion their own standards in light of the conditions and problems with respect to the relations between law enforcement officials and press in their own areas" and that the court would be powerless "to bar state courts *45 from responding in their own way and construing their own constitutions so as to recognize a newsman's privilege, either qualified or absolute".
We are, however, persuaded by the reasons and rationale set forth in Branzburg to adhere to that court's construction of the First Amendment application to a news reporter's testimonial privilege recognizing as did the Supreme Court that different circumstances might "pose wholly different issues for resolution under the First Amendment" and further recognizing the authority of the Florida legislature to adopt appropriate standards.
The appellant raises two other important considerations relating to her adjudications of contempt. It is asserted that the questions propounded by the grand jury were not relevant to or within the scope of the limited matters then under investigation. As previously stated, the grand jury was functioning under an order extending its term "for the purpose of concluding the two investigative matters initiated during its original term". We believe that the investigation of grand jury "leaks" was within the scope of the grand jury's extension order. We also believe that the questions propounded were relevant to the specific matters embraced with the extension order.
It is within the inherent power of the grand jury in order to preserve the integrity of its own proceedings to investigate breaches of secrecy. Furthermore, such power and authority is also within the ambit of the statutory language in section 905.095, F.S., which states in part that "a grand jury whose term has been extended as provided herein shall have the same composition and the same powers and duties as it had during its original term". If a grand jury can investigate "leaks" during its original term certainly such power continues during an extended term even though such "leak" may not be delineated within the "specific investigative matters" outlined in the extended order.[6] It would be ludicrous and somewhat "chilling", if a grand jury, when convened for any lawful purpose, could not investigate matters bearing upon its own sanctity and integrity, i.e. preserving the secrecy of its own proceedings, particularly where the violation is declared to be a crime. See footnote two, supra.
The remaining point raised by appellant for consideration is somewhat perplexing and one that has caused some difficulty and confusion among various courts. Specifically, the appellant contends that the constitutional prohibition against double jeopardy precludes appellant from being adjudged in contempt twice for the same offense.
As heretofore noted, appellant was held in contempt on April 30 as a result of her refusal to answer questions propounded by the grand jury on April 15. It is clear from the pleadings and orders in the record (and without dispute by the parties) that appellant's adjudication of contempt on May 30, as a result of her refusal to answer questions propounded by the same extended grand jury on May 6, involved the same subject matter and undoubtedly substantially the same questions for which she had been previously adjudicated in contempt on April 30.
It is axiomatic that double jeopardy attaches only to criminal offenses. See 9 Fla.Jur., Criminal Law, § 424. It would logically follow therefore that unless the adjudications of contempt can be denominated as "criminal" as distinguished from "civil" we need not consider the applicability *46 of the constitutional prohibition against double jeopardy. In Seaboard Air Line Ry. Co. v. Tampa Southern R. Co., 101 Fla. 468, 134 So. 529 (1931), the Supreme Court discussed several of the distinctions between civil contempt and criminal contempt. The court was careful to point out that it is "not always be easy to classify a particular act as belonging to either one of these two classes" as the contempt may possess the characteristics of both.
Often the denominating factor between the two types of contempt is not the fact of the punishment imposed but rather the character and purpose of the punishment. If the character and purpose of the punishment is coercive, i.e., if it is designed for the benefit of other parties and conditional imprisonment is imposed for the obvious purpose of compelling the contemnor to obey an order, then the contempt may be classified as "civil". In such instance the contemnor carries "the keys of [his] prison in [his] own pockets." Shillitani v. United States, 384 U.S. 364, 86 S.Ct. 1531, 16 L.Ed.2d 622 (1966); Yates v. United States, 355 U.S. 66, 78 S.Ct. 128, 2 L.Ed.2d 95 (1957).
If the character and purpose of the punishment is punitive, i.e. if it is designed to vindicate the authority of the court and an unconditional imprisonment is imposed for the obvious purpose of acting as a deterrent then the contempt may be classified as "criminal". Shillitani v. United States, supra, and Yates v. United States, supra. As the Court in Shillitani observed, "[W]hile any imprisonment, of course, has punitive and deterrent effects, it must be viewed as remedial if the court conditions release upon the contemnor's willingness to testify."
In the instant situation each of the orders adjudicating appellant guilty of contempt contained a conditional sentence. The appellant was entitled to immediate release if she would agree to answer the questions propounded by the grand jury  she carried the "keys" of her own prison in her pocket. It is clear from the above cited decisions that the contempt in question are "civil" contempt and not "criminal" contempt. Accordingly, the doctrine of double jeopardy is not applicable. See Yates v. United States, supra.
Although the characterization of the contempt in question as "civil" obviates any double jeopardy considerations it does not necessarily follow that multiple civil contempt penalties are permissible.[7] In Yates petitioner refused to answer questions on the same subject of inquiry on two separate occasions for which she was held to be in civil and criminal contempt. Although rejecting any double jeopardy argument the court clearly pointed out that only one offense of contempt was committed by the petitioner's repeated refusal to answer questions on the two different occasions. The court observed, at page 133 of Yates:
"... The policy of the law must be to encourage testimony; a witness willing to testify freely as to all areas of investigation but one, should not be subject to more numerous charges of contempt than a witness unwilling to give any testimony at all.
"Having once carved out an area of refusal, petitioner remained within its boundaries in all her subsequent refusals. The slight modification on June 30 of the area of refusal did not carry beyond the boundaries already established. Whereas on June 26 the witness refused to identify other persons as Communists, on June 30 she refused to do so only if those persons would be hurt by her identification. Although the latter basis is not identical to the former, the area of refusal set out by it necessarily fell within *47 in the limits drawn on June 26. We agree with petitioner that only one contempt is shown on the facts of this case."
The court further pointed out that although only one offense of contempt was committed it was of a continuing nature; and that each refusal continued the witness's defiance of proper authority. Although there could be a series of contemptuous acts, only one contemptuous offense occurred; so that only one penalty could be imposed. Cf. McDonald v. State, 321 So.2d 453 (Fla.App.4th 1975). The court, however, recognized the permissibility of imposing civil and criminal penalties for the same act of contempt recognizing that the civil and criminal sentences served distinct purposes  one coercive and the other punitive, further observing that "the same act may give rise to these distinct sanctions".
Applying the foregoing to the instant situation we are of the opinion that only one punishable offense of contempt was shown by the facts of this case as reflected by the appellant's conduct of April 15 and May 6. The contempt of April 15 was of a continuing nature as evidenced by appellant's refusal to answer questions on May 6. Multiple acts of contempt occurred for each refusal but only one civil punishment was proper. The appellant could have been subject to criminal sanctions for her May 6 refusal to answer questions but could not be subject to additional civil sanctions.
Although we recognize the inapplicability of the privilege asserted by the appellant and the power of the court to utilize contempt as a method of enforcing compliance with grand jury proceedings, the second adjudication of contempt and sentence of May 30, 1975 is vacated and set aside for the specific reasons set forth above. Additionally, in the interests of justice and in light of Shillitani v. United States, supra, it is necessary to vacate and set aside the sentence imposed pursuant to the first adjudication of contempt of April 30, 1975. See Rule 6.16, F.A.R. As the Supreme Court of the United States observed, "once the grand jury ceases to function, the rationale for civil contempt vanishes, and the contemnor has to be released". In the instant situation it is impossible for the appellant to purge herself of the contempt by answering questions before a grand jury whose extended term concluded on June 22, 1975. The fact of the fortuitous circumstance of the grand jury term expiring before sentence is served or completed is irrelevant. The purpose for an adjudication of civil contempt with its conditional punishment during a given grand jury term vanishes with the demise of that grand jury.[8] It makes little difference that the sentence or punishment was prevented by the contemnor's exercise of his right of appeal.[9]
Accordingly, the order of April 30, 1975, adjudging appellant guilty of wilful contempt is affirmed but the sentence is vacated and set aside; the order of May 30, *48 1975, adjudging appellant guilty of wilful contempt and the sentence thereon are vacated and set aside. The cause is remanded to the trial court with directions that appellant be discharged.
OWEN, J., and LEE, J. CAIL, Associate Judge, concur.
NOTES
[1] The 1974 Fall Term of the Brevard County Grand Jury, which was impaneled on October 8, 1974, was extended on March 20, 1975 to a period ending June 22, 1975.
[2] Sec. 905.27, F.S., makes it unlawful to disclose grand jury testimony with certain exceptions and provides that a violation of that section constitutes a misdemeanor.
[3] The following colloquy between the special state attorney and the appellant illustrates generally the nature of the inquiry in each instance and the substance of the response in each instance:

"Q Miss Tierney, as I had informed you the last time, this Grand Jury has authorized me to grant you immunity from prosecution for a crime concerning the contents of an answer that you would give to that question, or any other question that may be posed to you at this session. Then, with that knowledge, are you still using that same grounds, the First and the Fifth Amendments?
"A Yes.
"Q Miss Tierney, has any person claiming to have been a witness before this Grand Jury or actually known to you to have been a witness before this Grand Jury, giving [sic] you information as to his or her testimony given here regarding any questions that were posed to them before this Grand Jury?
"A I won't answer that.
"Q Would you tell us the reason for not answering that question?
"A The Fifth and the First Amendment.
"Q The same grounds as you gave earlier?
"A Yes."
[4] The instant case, unlike Branzburg, is not concerned with the publication of any news article based upon confidential sources of information. The various pleadings and orders in the record reflect that the appellant was called before the grand jury to elicit information which the grand jury apparently believed appellant to possess relating to a "leak" or information about the subject matter then under grand jury investigation.
[5] Our reading of Branzburg differs somewhat with that of the Second District. We are of the view that Branzburg does not require nor has it established the tripartite criteria applied by the court in Morgan.
[6] It seems somewhat incongruous to suggest that it would be necessary for a grand jury serving during an extended term to refer the investigation of breaches of secrecy to another grand jury sitting during an original term; or even to require that order extending the grand jury to be amended to include "investigation of leaks from within".
[7] The contempt order of April 30 imposed a six-hour jail sentence; the contempt order of May 30 imposed a 30-day jail sentence and a $500 fine.
[8] We do not decide the question of whether appellant would be subject to civil contempt and sentence because of similar actions before a successor grand jury. It is clear from Yates that a criminal contempt and sentence for the same act would be permissible. We merely conclude that the sentence imposed during the extended grand jury term cannot be continued to a successor grand jury term. But see f.n. 8, Shillitani v. United States, supra.
[9] Yates would seem to suggest a procedure that would obviate this occurrence, namely, "[to] first apply coercive remedies in an effort to persuade a party to obey its orders, and only make use of the more drastic criminal sanctions when the disobedience continues". The court can either find the defendant guilty of criminal contempt at the termination of the grand jury and impose a criminal sanction which is not related to the grand jury term or it can enter an adjudication of criminal contempt at the same time as the civil contempt occurs but postpone imposition of a criminal sentence until termination of the grand jury. Cf. Aaron v. State, 284 So.2d 673 (Fla. 1973).